Good morning, Your Honors. May it please the Court, Joseph S. Porta for the Petitioner, Xiao Guanggu. If possible, I'd like to reserve a couple of minutes, two minutes for rebuttal. Sure. Before us is a factually undisputed record. The only issue on appeal is basically eligibility for asylum, and as such, it has a substantial evidence standard. The Petitioner in this case is a Chinese Christian, and he claimed asylum based upon a detention, a beating, and dissemination of religious materials, and he fears return to China for the same reasons. The record as a whole paints a grim picture of the hardship that Chinese Christians face. He has provided credible testimony to establish the beatings, and they were, the beatings were basically brought about by a rod hitting the Petitioner in the back ten times while he was detained at the local police station. It did cause some welts. There was no scarring, but there was some serious beating happening. Now, the IJ and the BIA, they both felt that this didn't amount to persecution. This Court, under Corbellina, which is 158 F. 3rd. 1038, it's a 1998 case out of the circuit, states that it's necessary to look at the cumulative harms and abuses. Now, I want to discuss those a little bit. This case stems back to 1997, this is specifically in October. The Petitioner was at work one day, and he was surprised by the police officials when they arrested him, and he was forced to go to the police station. There, they told him about the fact that he was disseminating Christian materials, and they knew about it, and they began to beat him. They beat him ten times with a baton, as I had mentioned earlier, and he was in detention for three days. Ultimately, he was released after his relatives had posted a bond. Now, after he was released, he, right before the release, he was required to sign a guarantee letter, and the basic gist of this guarantee letter was that he wasn't going to disseminate any further religious materials. He did return to work. However, upon his return to work, he was threatened specifically by his employer that if he engaged in similar behavior, he would be terminated. Second of all, there's a little bit of confusion in the record, but upon careful review again, I do submit to the Court that he did not, was not freely able to practice his religion. He instead stated in the record that he was, did not dare go back to his church, that he chose to practice at his home and read the Bible at home alone. And everybody was making a big deal about that in the lower courts, and I don't feel that there's enough of a record to really make that determination. Now, the government or the attorney general cites that this isn't past persecution and that the Petitioner hasn't met his burden for a well-founded fear of persecution. I don't see that there's any discrepancy in the record with result to the beatings. It was, he was beat ten times. It was with a rod. It was by a government agent, and it was because of a protected ground, his religion. Well, how do you distinguish those cases that we've previously decided where abuse, which was far worse than what your client says he suffered, was found not to be sufficient to establish persecution? Well, there are cases that are far worse, Your Honor. I think in this circumstance, there's a pretty wide pattern and practice of this type of behavior in China, and I think that should lend a little bit of credence to be a little more lenient on that aspect. Is that the distinguishing factor? Because the cases that I have in mind, you know, come, for example, from the Punjab, where we hear these cases all the time where it seems they're sort of a standard MO by the police to treat arrestees the same way your client says that he was treated by the Chinese. Yeah, but those Punjabis are tough. They can take it better than the Chinese. Well, my basic argument that I'm trying to make to the Court today is I do believe that this type of mistreatment is persecution. We're supposed to look at this on an individual level. I respect your belief, but that's not the question. The question is, how can you help me, if you want me to rule in your favor, distinguish prior Ninth Circuit authority holding on facts that are more egregious than what your client claims to have suffered, that that wasn't persecution for purposes of the refugee? I submit, and I have no argument in case law to distinguish, but there is another way around this. The other way around this issue is the fact that he can establish his relief by past persecution or a well-founded fear as well. The past persecution alone isn't determinative. He has all this abuse that he suffered, which I don't believe the government is contesting at all. So now we can just run a well-founded fear analysis. And all of those aspects are relevant in making that determination. Additionally, something that neither the I.J. mentioned in denying the well-founded fear, nor the BIA mentioned it, was the fact that after the petitioner arrived in the United States, he mailed some more religious materials back to China. The authorities went to his home searching for him. There's not much testimony on it, but the judge and the government are arguing now that this is really he should be faulted because he doesn't really have a lot of information. The record does reflect that the petitioner learned that the authorities went to his home through a friend. Now, this friend was told to call the petitioner by his relatives because his relatives were afraid. So he received a third-party call that's completely new. And so the details are pretty scarce, if none. He received a call saying, please don't call your family. People are after you. I don't believe that the petitioner was probably in a valid position to be asking a lot of details at that point. He kind of took the fair warning and decided to get on with his life. Now, I do believe that independently, the petitioner in this matter has established a well-founded fear. Alito, was this claim raised to the immigration judge at the hearing? The claim raised to the immigration judge was a straightforward asylum application, and you can either prove it by past persecution or by a well-founded fear. Right. But the question I'm asking is the representation you just made to us with regard to what happened after he came to the United States, is that in the record before you? It's in the record in testimony. It is. So the immigration judge had that evidence before him and still ruled against you? Yes, Your Honor. It's actually in two places. It was in his direct testimony. It was also in the cross-examination. And I'm not entirely sure, but I'll look into it while the government's arguing. I believe it was also in his written affidavit attached to his I-589, the asylum application. There's no mention of this in any of the decisions thus far. Basically, they are citing the fact that he was able to return to work, the fact that he didn't tell the truth to obtain a visa, which we've been discussing this morning, which in itself I don't think — there's not a lot of testimony on it either. He was just — he told that he was coming for business purposes when, in fact, he was fleeing. Well, I mean, let's go back to that. Why is it improper for a fact-finder to consider evidence that the Petitioner has lied in connection with his entry into the United States as a basis for determining that he may not be credible? Well, I have two answers for that. First of all, there was no credibility determination at all in this case. And under the circuit's law, then the testimonies rendered true. The BIA didn't address it. The IJA didn't address it, first of all. Second of all, I think that this is a determination that is proper when exercising discretion to grant the case after the person's established their verdict. Why is it improper? As I recall, and I've read so many IJA records this week, I think this is the same case. Is this one where your client paid some friend $5,000 or $8,000 to get a business visa? They arrived on the jet at LAX, and then the friend disappeared, and your client has no idea? I believe everything that you said is accurate with the exception of the price. I believe there was about $1,000 or something that was mentioned in the record. But everything else I believe is pretty accurate. Why can't the IJA look at that and conclude that what we're dealing with here is he went to an alien smuggler and paid him for a false document, and as soon as they got safely through the arrival area at LAX, the smuggler disappeared into the community in Los Angeles? Well, for sure. Why isn't that a relevant factor for the immigration judge to consider in determining whether to exercise the Attorney General's discretion in this case? Well, it is a relevant factor to decide discretion, but that case didn't get this far, better said. The judge said that it wasn't past persecution, and in a terse one or two lines, he said this isn't a well-founded fear, so he never got to the point where he was exercising discretion in this matter. He did consider it, and he kind of deemed that, although he found him credible, he started using this against him to say whether he established his burden of proof. Now, I argue that neither of these things are actually sufficient for the fact that they're not material to the direct claim. None of this, let's assume he did pay – let's assume he did lie, and let's assume he did pay a smuggler. None of this goes against the fact that he was detained, he was beaten ten times with a rod, and that he – if he didn't suffer past persecution, at least it's definitely harm, and some harm that's relevant in assessing future fear. Now, you can weigh that in, but I don't think the fact that he lied, given the fact – given the circumstances of his beating, are dispositive of his fear. I don't think that I personally, if I had to flee from a country where someone was beating me, and I go to another government that I have no idea who they are and I'm applying for a visa to leave, I may not be forthright. The fact of the matter is he was frank with the court. The court asked him, how did you get your visa? He told him exactly how it happened. The government didn't even charge him with fraud on the notice to appear. They charged him as an alien overstay, as in INA Section 237a1b. There was no – this was a kind of a hindsight that the judge kind of used to bootstrap his decision upon, but it wasn't something that was really a concern for the government when the notice to appear was filed. Kennedy. Counsel, you used all your rebuttal time in answer to Judge Palmer. I apologize. I've got a question, and I think maybe the presiding judge will give you some rebuttal time, but let me put my question. Go away. Go away. Would you distinguish for me the standards that we talked about in evidence, preponderance of the evidence, substantial evidence, and clear and convincing evidence? I thought the rule was when we – when somebody is adjudicating a case at the trial level, what the trier of fact is looking for is a preponderance of the evidence. That's correct. Now, what are these other standards that are getting injected into immigration cases? Well, it depends. It depends on a – for example, I know that there's a clear and convincing – the preponderance of the evidence is 51 percent, okay? And the preponderance of the evidence is usually the – The preponderance of the evidence is more probably true than not. Correct. So – correct. I'll leave it at that. Proper statement. Now, that is – that is the alien's burden, basically. Now, clear and convincing, there's some other elements of immigration law, specifically asylum, where that comes into play. Usually, clear and convincing evidence comes into whether the alien has satisfied the one you're filing. Higher than a preponderance? Oh, absolutely. Clear and convincing, in my opinion, would be much higher. That's when cut below the criminal standard of beyond a reasonable doubt? I would say it's pretty close. I don't know exactly where it would fall within it, but – It's a broad standard, isn't it? It means highly probably true. Right. It means, yeah, there's a couple of percents that it may not happen. I've got my grade and I've got my law school notes right here. I left mine at home, personally. But – Okay. Now, you argue in this case that what I'm looking for is not a preponderance, not clear and convincing, but I'm looking for substantial. Is that just some evidence in quantity? It's a tough standard. It's – I'd like to get a handle on it. You know, I've been reading these cases, too, and I'm a little bit at odds to tell you what substantial evidence. I know that substantial is – You argued it to me. That's what you opened up with. You just went right through it. There's substantial evidence for my case. I believe there is substantial evidence to hold. What do you mean by substantial evidence? Well, we have an undisputed record. I mean, is it 10 percent? No, I believe substantial evidence. I can't quantify it. Okay. I can't quantify it. I see it a little bit more amorphous. I see it – I don't know exactly what it is, Your Honor. But I see it in this matter that there is substantial evidence supporting that this man was – There's another definition, then. I mean, that's the way you want me to approach this case. You used it. Can you repeat that, please? I'm sorry. I didn't hear you. It's a nothing standard. That's the way you want me to approach it. No, I don't want you to – I don't want you to approach it like that in any matter. But substantial evidence, I would probably analogize it a little bit more to preponderance of the evidence, not necessarily clear and convincing, because that's substantial. Substantial means more likely than not. Clear and convincing means pretty darn sure that it's not going to be. And semantically, I would argue that substantial evidence more approximates a preponderance of the evidence standard. I'm a chief judge for rebuttal. Thank you. You get a C-plus on that evidence question. Thank you. That was a high grade when I went to school. I bet that's right. Before a grade in place. Good morning, Your Honor. Dan McClain on behalf of the respondents. Mr. McClain, did the department charter an airplane to fly all the oil lawyers out here? They may well have. They could have. They did not. We're going to save the taxpayers. As I was sitting in the airport for six hours yesterday, I was wishing that they had. They have. Yeah, well, next time go on a hunting trip. Your Honor. In the Louisiana swamp. The petitioner has failed to prove that no reasonable fact finder could conclude, could fail to conclude that he was eligible for asylum. That's the standard of review in this case. Judge Beeser asked, what does substantial evidence mean? As this Court has developed, substantial evidence means that there's, it's an extremely strict and deferential review to the board. And to overturn it, you have to show that no reasonable fact finder could possibly have concluded it the way that the agency did. And through that prison, we view this case. How are you going to define substantial evidence? We're looking at probability, see? I learned this from my professor, you know. The law of probability is the law of life. Think about that. That's a sermon. Now, on what scale is that? You know, you've got more probably true than not, highly probably true. Near certainty. That's beyond a reasonable doubt. Well, the British say you must be sure, so they put it higher than we do. They say certainty. So where are you going to put substantial evidence? Substantial evidence, as has been interpreted by this Court, is farther along the spectrum of clear and convincing evidence. It's a different standard. What do you base that on? Well, the Court has said in this case, in the lies Zacharias, this Court didn't say it, but the Supreme Court said it. And in this Court, followed the lies Zacharias and said the Court must uphold A lot of those people went to Yale. They don't teach evidence. Went to Harvard. Went to Harvard. Well, the standard view is, and I'm quoting from the Singh-Cower case, that this Court decided that you must uphold the Board's findings unless the evidence presented would compel a reasonable finder of fact to reach the contrary result. To put it in a more prosaic way, if you were in a trial, in a civil trial, would there be, would you have enough evidence after a jury verdict to allow the jury verdict to stand? In other words, it's got to be, to find that there was no substantial evidence you would be essentially trying to set aside a jury verdict and deciding it as a matter of law. In this case, that's the lies Zacharias case. In the Supreme Court. In this case, we have substantial evidence that supports the Board's finding and the immigration judge's finding that Mr. Gu did not suffer past persecution and did not have a well-founded fear of persecution. He didn't lose his job as a supervisor in the government factory. The police lost interest on him after a couple weeks. He was even He might have signed a paper that he wasn't going to go to the Christian church and pass out stuff like that. That's correct, Your Honor. He signed a paper. They got a billion and a quarter people to look at. He spent all their resources like, you know, our Justice Department. He spent all the resources on this one guy. Well. He signed up. But that's part of our point, Your Honor. The police said to him, come back and see us every week. After three visits, they lost interest in him. His family, there was no evidence that his family, who still lives in China, is subject to harm, threatened in any way. He was able to travel freely on his own passport. And Judge Tallman asked about the fact that he did lie to get his visa and asked if that's relevant. And we respectfully suggest that it is relevant. And it's relevant not only for the fact that he lied to get the visa, but that he then tried to extend his visa, the business visa. And only then, after that extension was denied, did he claim asylum. So our position is not only that the immigration judge and the board didn't find that that issue went to credibility, but it's our position, we respectfully suggest, that that goes to whether he had a well-founded fear of persecution. When you don't apply for asylum after you're in the country on a fraudulent visa, after you try to extend the fraudulent visa, and then only when you're in removal proceedings do you apply for asylum, we suggest that that goes to the issue of whether there's a well-founded fear. And as Petitioner's counsel. Well, you know, I've got this case here, and it's called Akinmati. And hold on. We've got a good panel. Reinhart, Wiggins, and Hawkins. And this is Reinhart's opinion. He says, similarly, in the present circumstances, Akinmati's misrepresentations to immigration officials in the course of fraudulently entering the United States are wholly consistent with his claim to be fleeing persecution. Well, Your Honor, in this case, the fraudulent representation was made not to the Chinese officials, but to the American officials. Not only when he entered the country, but also after he was in the country safely, free to make an asylum claim, attempted to extend his business visa. So we respectfully suggest that that is distinguishable from this case. There also is, as Judge Coleman pointed out, case law that shows that Petitioner, aliens who have suffered worse beatings and worse harassment, because of the standard of review, the substantial evidence standard of review, this Court concluded, we're not going to second-guess the Board's decision that the Petitioner didn't suffer persecution. Here, he was detained, he was interrogated for about two hours. He was hit with batons. There's no question about that. He was hit about ten times. But he suffered no lasting marks. He may have gotten a bloody nose also, Your Honor. But he required no medical attention. And the police, as in Prasad, the police lost interest in him. It was unclear in this case whether he was charged with any crime. But here, certainly, the police lost interest in Mr. Gu. They said, after three times, check back with us, and then we don't really check back with us anymore. So. Yeah. Well, that's the broken window theory. Well, the record is unclear, Your Honor, as to why, obviously, because we didn't have the police come in and testify. But the important point is that he wasn't subject to further harassment or persecution. And also, as the board and immigration judge referred to, the state and country reports showed that household churches in China generally are not viewed as a problem by the government and not taken action against by the government unless they become too large or unless they start to use state facilities and things of that nature. Here, this is a household church of about seven members. This is not an obtrusive household church that was of the type that's noted in the state and country reports, and therefore, that also supports the board and immigration judge. But he's passing out literature. He was passing out literature, Your Honor, yes. But in this case, again, it's. He sent more when he got here. He sent more after he got here. He did send more after they got here. I mean, that guy's pretty dangerous. Well, if they had said that, Your Honor, it might be a different case. But there isn't that evidence in this case. What happened is that his family said that police came and said, come back and we want you to talk to us when he comes back. There's no evidence that his family was harmed. There's nothing other than this hearsay statement that we have in the record. For all the reasons I've discussed, we respectfully suggest that substantial evidence supports the board's finding that Mr. Gu did not suffer past persecution and did not have a well-founded fear of persecution. And unless the Court has any other questions, I'll let you take them. Thank you. Thank you very much. If I would, if only to save face on my C-plus. What? If only to save face on my C-plus. It's a good grade. Now. When I took evidence, you want to listen to this? Absolutely. You know how many A's were given out in the class of 70? Probably zero. You're pretty smart. Now, one, two B's, about 10 C-pluses, and the rest were C's. I'm ahead of the curve. You are. Assuming you're using that standard and not a more modern one. No, no. Now, to answer Judge Beezer's question. It's a modern standard. They give everybody A's. Now, taking the Attorney General's statement, and I agree with it that no reasonable fact finder could conclude otherwise. I believe that no reasonable fact finder could conclude otherwise that the well-founded fear standard hasn't been met. He was targeted while he was there for distributing literature. He was beaten. He was monitored. He signed a confession. After he came back, he still sent further religious literature, and they came to see him. There's no question that this is a well-founded fear. I don't see if this is all true facts, as a record is a credible record. I don't see how a fact finder could say otherwise, that a person doesn't have a well-founded fear. One thing I would like to note from the Court is that in assessing a well-founded fear standard, that no reasonable fact finder could find otherwise. But I would note that the Supreme Court, back in the case of INS v. Cardoza-Fonseca, says that when they look at all these factors in the aggregate, it's they don't require a certainty of persecution or even a probability of persecution. And it's a well-founded fear of persecution when the person's there. Now, that's what we're seeing is whether no reasonable fact finder could determine that there's a reasonable possibility. That's at 10 percent. Exactly. That's in a footnote, I believe, in that decision, that they said it could be as little as 10 percent. And I believe that if you've gotten 10 times, if we just give one percentage point to each baton strike, we've already met our standard. And given the fact that after he left, they retargeted him, I believe that clearly exceeds that standard. And given this evidence, if it is all true, I don't see how a reasonable fact finder can't do that. They hit him with a baton, they give him a bloody nose, they whirl him around in a chair, and they say, well, when he comes back, we want to talk to him. Right. Now, I don't know what talking means. The way they talked to him in the past wasn't a good indicator of what the chat's going to be like once he arrives back in the country. Okay. All right. Thank you, Your Honor. Thank you. Oh, by the way, Judge Tolman, the sites to or they're on pages 170 and 395 of the record. Thank you. You're welcome. Okay. All right. Now we go.
judges: Pregerson, Beezer, Tallman